UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> **v.** <br><br> **RALPH JOSEPH CELENTANO III,** <br><br> **Defendant.** | **Crim. Action No. 22-186 (TJK)** |

**DEFENSE SENTENCING MEMORANDUM**

Ralph Celentano is a 55-year-old man who has no criminal record. He spent the vast majority of his adult life working hard until he was no longer able to as a result of debilitating medical issues. At trial, he expressed deep remorse for his actions on January 6, 2021. He explained that he went to Washington, D.C. to see then President Trump speak, and had no intention of stopping the electoral count. While Mr. Celentano wholeheartedly accepts responsibility for the choices he made, he asks this Court to see him as more than the worst three minutes of his life.

When looking of Mr. Celentano's specific conduct on January 6, 2021, as well as his personal history and characteristics, a period of incarceration is not warranted, no less the lengthy one that Probation and the government recommend. Mr. Celentano respectfully requests that the Court consider his lack of criminal history, serious medical disabilities, and his genuine remorse which he expressed at trial and grant a variance from the guidelines range and fashion a non-custodial sentence that includes twelve months of home detention and community service as conditions of probation. Such a sentence is sufficient but not greater than

necessary to accomplish the goals of sentencing.

## I.      Sentencing Guidelines Calculation

Mr. Celentano maintains his objections to the Pre-Sentence Report ("PSR") and hereby incorporates all factual and legal arguments previously made. *See* ECF No. 82, attached as Exhibit A.[1] The defense contends that Mr. Celentano's total offense level is 13, and submits the following offense level calculation:

**Guideline Calculation**

| | |
|---|---|
| **Base Offense Level (U.S.S.G. § 2A2.4(a))** | **10** |
| **Specific Offense Characteristic - Physical Contact (U.S.S.G. § A2.4(b)(1)(A))** | **+3** |
| **Total:** | **13** |

With a criminal history category of I, Mr. Celentano's Guidelines should be calculated at 12-18 months. Further, Mr. Celentano falls within "Zone C" of the Guidelines Table, allowing this Court to give a Guidelines sentence that substitutes one half of the recommended term of imprisonment with community confinement or home detention.  *See* U.S.S.G. § 5C1.1(d)(2). However, for the reasons stated below, irrespective of the Court's Guidelines calculation, a

---

[1] On October 26, 2023, defense counsel filed a 30 page document with numerous factual and legal objections to the PSR and provided citations to transcripts and exhibits from trial. Probation has not adopted a single change offered by the defense in the (un)revised final PSR.  Probation also did not take defense counsel up on their offer to provide transcripts or exhibits to Probation. It is deeply concerning to counsel that the PSR, a purportedly neutral document created by United States Probation, an arm of the Court and not the U.S. Attorney's Office, is relying wholly on the government's perspective of the case, rejecting the jury's verdict and turning a blind eye to the actual transcripts of the trial.

Counsel notes that Exhibit A differs slightly from the originally filed objections found at ECF No. 82. After filing, counsel identified two errors in the original document which were brought to the attention of the Government and Probation. The revised document is attached as Exhibit A.

below Guidelines sentence is sufficient but not greater than necessary to accomplish the sentencing goals of deterrence, rehabilitation and just punishment.

## II.   Personal History

Ralph Joseph Celentano III stands before this Court as a 55-year-old man preparing to be sentenced on his first criminal conviction. Mr. Celentano is more than the text messages, social media posts and videos that the Court saw during trial. He loves the ocean and the outdoors. Until recently, he spent much of his free time surfing and skateboarding. Mr. Celentano also loves the work he did for over 30 years as a carpenter and a mentor to younger carpenters. He is proud of the many projects he has contributed to over the years throughout New York City. Unfortunately, in 2018, Mr. Celentano had two serious work-related injuries. He has endured six surgeries since 2018 and is physically limited and unable to work. The injuries changed Mr. Celentano's life. He could no longer do the physical activities that were his outlets. And he could not do the job that he had done for the last 30 years. He was in constant pain and ended up spending most of his time in his house, watching and reading the news from sources that provided misinformation. While there is no excuse for Mr. Celentano's conduct on January 6, 2021, it is important for the Court to know who Mr. Celentano is at his core and how he ended up before this Court.

### a.   Early life

Ralph Joseph Celentano III was born in 1967, in Queens, New York to his father Ralph Joseph Celentano Jr. and his mother Patricia Ann Celentano. Mr. Celentano's father left the family when Mr. Celentano was approximately two years old, and Mr. Celentano did not see or speak to his father again until he was an adult. When asked how it felt to grow up without his

father, Mr. Celentano said, "it felt like half a family." Mrs. Celentano was left to raise her two

boys by herself, and while Mr. Celentano had his basic needs met, life was not easy. Mrs.

Celentano went back to school when Mr. Celentano was five years old and she became fixated

on her education. Until Mr. Celentano's stepfather moved into the house the family had to

consistently worry about money. Mrs. Celentano married Mr. Celentano's stepfather, Michael

Fitzgerald, when Mr. Celentano was approximately seven years old. Mr. Celentano did not share

a close relationship with Mr. Fitzgerald – he was simply "[his] mother's husband." However,

when Mr. Fitzgerald and Mrs. Celentano divorced after being together for six years, Mr.

Celentano not only lost his stepfather, but he also lost his mother. After separating from Mr.

Fitzgerald, Mrs. Celentano moved to Manhattan to further pursue her education and, as Mr.

Celentano says, "live her life." Mr. Celentano was only 13 years old when his mother left to

move to the city, and he moved in with his grandmother whom he lived with until he was old

enough to move out on his own and financially support himself. When asked how it felt that, as

an adolescent, he was not living with or being raised by either his mother or father, Mr.

Celentano said "my grandmother and aunt were great, but they didn't fill the void."

Despite experiencing a lot of chaos and upheaval in his childhood and adolescence, Mr.

Celentano feels extremely lucky for his life. While there were struggles in his relationship with

his mother, he felt and feels a deep connection with her. He received a lot of love from his

grandmother and found solace in religion. As a child he was raised Catholic and went to church

several times a week. He also became very involved in the Boy Scouts as a child, maintaining

that connection throughout his adolescence and found tremendous joy in being a part of that

organization. But more than anything, it was the ocean and the outdoors that brought him peace.

### b.  Love for the Outdoors

Growing up near the beach, Mr. Celentano always loved the ocean. But it was in 1975 when he surfed for the first time that he discovered his passion for it. And, during the same year, he began skateboarding – something he would do every single day until his accidents in 2018.

When asked what he loves so much about surfing, Mr. Celentano said, "being out on the ocean, riding a wave, is the ultimate expression. You can be yourself. It doesn't matter if you mess up, you will still have the best day." From 1975 through 2018, Mr. Celentano surfed whenever and wherever he could.  When he wasn't in the water, he was on a skateboard. He would take the train to Manhattan for work and skateboard from the subway station to his work sites. Being physically active and outdoors were incredibly important for his physical and emotional health.

### c.  Pride in being a Carpenter

Shortly after graduating high school in 1986, Mr. Celentano joined the United Brothers of Carpenters, Local 45 in Queens, New York and began his four-year apprenticeship. Mr. Celentano was determined to be financially independent and pursue a career in a trade he was passionate about. For the next thirty years, Mr. Celentano worked in every area of carpentry, on every type of building, and discovered his love for mentoring younger carpenters.[2] In reflecting on his career, Mr. Celentano talked about how much joy he got in "building something from nothing." For Mr. Celentano, seeing how delighted his clients would be at having their "dream house rebuilt," brought him happiness. When he is in the city or the airport and sees something he helped build, he feels a deep sense of pride.

---

[2] Between 1994 and 1999, Mr. Celentano worked as a teamster for the United Brotherhood of Teamsters because the carpentry work was not steady, but he remained a member of the carpentry union.

In addition to the work itself, Mr. Celentano loved being a part of the union and mentoring younger carpenters. He said, "it is super gratifying to run into carpenters now that remember the things I taught them." The pride was evident in his voice when he said, "I ran into someone I mentored with his children, and he turned to his children and said, 'that is the guy that taught me to be a carpenter.'" For someone like Mr. Celentano, who endured chaos during his childhood and grappled with feelings of abandonment, being a part of the union felt stabilizing. It was essentially a built-in family, with people that he knew had his back. He found the camaraderie as an adult that he enjoyed so much when he was a part of the Boy Scouts.

Mr. Celentano's career as a carpenter gave him a sense of purpose, and something he was deeply proud of. When he had two serious work-related accidents in 2018 that resulted in him not being to work anymore, he lost a lot of his sense of purpose and his sense of self.

### d. Medical Conditions

As previously discussed, two prominent themes in Mr. Celentano's life are his love of physical activities like surfing and skating, and his dedication to the art of carpentry. In 2018 those pieces of his identity were taken from him. Mr. Celentano's physical abilities became severely hampered after several workplace injuries, leaving him unable to do the things he loves.







**e.  Family**

Despite having complicated relationships with both of his parents, Mr. Celentano cares

deeply for them. Mr. Celentano's first memory of his father was not until adulthood. When Mr.

---

[4] Columbia University, Anterior Cervical Discectomy,
https://www.neurosurgery.columbia.edu/patient-care/treatments/anterior-cervical-discectomy.

Celentano was able to reconnect with his father, he was the only one of his father's children that was willing to forgive him. They fostered a relationship and remained in contact until 2018, when Mr. Celentano's father passed away from cancer. When asked how he was able to forgive his father for abandoning him, Mr. Celentano grew emotional said, "everyone deserves to have someone to love them. My father was sick and he needed love in the last years of his life."

Mr. Celentano's relationship with his mother also had ups and downs, but they remain close. While Mrs. Celentano does not condone Mr. Celentano's actions on January 6, she remains supportive of her son, and traveled to Washington D.C. during his trial to demonstrate that she continues to stand behind him. *See* Exhibit E, Ltr. of Support, Patricia Celentano.

Unfortunately, Mr. Celentano's difficult relationships with the two mothers of his children, and his arrest on the instant case, have impacted his relationships with his own children. At the time of the Presentence Interview ("PSI"), Mr. Celentano still had an open case in family court for reduction of child support with the mother of his older children (three of which are over the age of 18). PSR ¶ 80. That case has since been closed. However, Mr. Celentano recently filed for visitation with his two younger children. His two younger children just relocated to New York from Florida which enabled Mr. Celentano to file for visitation – something he has wanted to do since Raina Rossi, the mother of his two youngest children, denied Mr. Celentano visits with his children beginning in November 2021. That case remains pending. Because of the various court cases, the defense is not going to respond to many of the allegations made by Ms. Rossi in the PSR. *See* PSR ¶ 81.[5] Mr. Celentano's silence during the PSI on the issue of his

---

[5] As detailed in the defense's objections to the PSR many of Ms. Rossi's allegations are demonstrably false and unreliable. *See* Exhibit A, pgs. 28 – 30. Therefore, if the Court were to consider Ms. Rossi's letter under the § 3553(a) factors, the defense is requesting a *Fatico* hearing.

current relationships with his children was on the advice of counsel due to ongoing litigation and should not be misinterpreted to suggest that Mr. Celentano does not care deeply for his children.

Mr. Celentano lives with his current partner, Jennifer Blake. As Mr. Celentano said when asked about Ms. Blake, "Jennifer was my first love." Mr. Celentano and Ms. Blake first met back in 1987 and attended Ms. Blake's prom together. They both went on to live full separate lives until they reunited almost thirty years later. For the past ten years, they have been in a deeply committed relationship. The very real possibility of a carceral sentence has been extremely difficult for both Mr. Celentano and Ms. Blake. As Mr. Celentano said, "I feel tremendous guilt about what my actions have done to Jennifer. She has had to put her whole life on hold." And, as Ms. Blake said in her letter of support, "He worries about me and I about him if he was to be incarcerated we would both be losing our best friends." Exhibit F, Ltr. of Support, Jennifer Blake.

### III.    Nature and Circumstances of the Offense

In the early morning hours of January 6, 2021, Ralph Celentano left his home in Broad Channel, New York and drove with his partner, Jennifer, to Washington D.C.  *See* Trial Tr. of June 8, 2023, at 1138. The two of them were traveling to the "Stop the Steal" rally to see President Trump speak. *Id*. at 1137-1138. Mr. Celentano believed that this would be the last time that the President would be speaking as President. *Id*. His intentions in traveling to Washington, D.C. were to witness that speech and then "walk around the mall and see the different monuments and things." *Id*. at 1138.

The actions Mr. Celentano took in advance of attending the rally further evidenced his intentions. He dressed in warm clothing, not riot gear. *Id.* at 1140-41. He brought food to eat and chairs to sit in, not weapons to use or shields to protect himself. *Id.* at 1138. He traveled with his

girlfriend and was not part of any larger group or organization. *Id.* The government's case agent agreed at trial that Mr. Celentano never posted online, or texted anyone, about stopping the electoral count or harming Mike Pence. *Id*. at 1021-22. He did not even understand that the electoral count was happening after President Trump's speech. When asked at trial what he believed was happening he stated "I thought they would just, you know, strike the gavel at 10:00, have their pomp and circumstance thing, and it would have been over." *Id.* at 1154. He did not believe proceedings were ongoing when he arrived at the Capitol much later that afternoon. *Id.*

After attending the rally at the Ellipse as planned, Mr. Celentano followed the massive crowd to the Peace Monument. *Id*. at 1147-48. There, in an open-source video recording, he said, "Someone's gotta do something!" When asked by someone off camera, "What do you think we should do?" he replied, "Occupy the Capitol, it's our building." Mr. Celentano testified at trial that when he said, "Occupy the Capitol," he was equating it to "Occupy Wall Street." In using the phrase "Occupy" he testified his intentions were to protest "like we did at Zuccotti Park in Lower Manhattan, just to stand outside and occupy space." *Id*. at 1150.

Mr. Celentano then continued to follow the crowd to the Capitol building, making his way to the west side of the Capitol, facing the police line that had been formed. Mr. Celentano readily admitted at trial that he "lost [his] cool" and that his words and actions were "horrible." *Id*. at 1156. The man next to him linked arms with Mr. Celentano and they walked toward the police line, pushing into it and breaking the line. *Id*. at 1157. In doing this, Mr. Celentano made physical contact with Officer Abdi, pushing against him and his baton. A melee of officers and protestors ensued. Mr. Celentano pushed another officer who he testified hit him in the melee as he was attempting to get his hat, which had fallen off. *Id.* at 1162.

Mr. Celentano then found Jennifer in the crowd. In an effort to move away from the melee, they made their way up the stairs of the West Terrace to safer ground. *Id*. at 1163-64. There, Mr. Celentano saw Officer Ellis repeatedly striking a protestor in the crowd below the terrace with his baton. *Id.* at 1166. As Mr. Celentano testified

> I just saw that person couldn't move or get away from the position he was in and that he was just being hit constantly over and over…I walked in that direction. I wish I didn't, but I did. And walking over, I kept thinking, you know "Just stop hitting him. Stop hitting him." And when I was about three steps away, I leaned my shoulder down, and I rammed into the officer.

*Id*. at 1167. From Mr. Celentano's first interaction with the police line on the lower West Terrace to his push of Officer Ellis was less than three minutes. There is no evidence that Mr. Celentano physically interfered with any officers before or after that less than three-minute period. Notably, Mr. Celentano never entered the Capitol building. *Id.* at 1173.

In the aftermath of January 6th, 2021, investigations by journalists and the Department of Justice have made clear that there were people who traveled to Washington, D.C. with intentions of chaos and violence on that day and others who were simply there to see a speech or be part of a protest. It is clear that Ralph Celentano falls in the latter. He is a man who deeply believed the election was stolen, who was disaffected by his government, and who received his news from sources that fed him misinformation.

In the sentencing of Andrew Cavanaugh, the Honorable Amit P. Mehta reflected on the troubling fact that many ordinary Americans with no criminal history (like Mr. Celentano) acted out of character when they were subject to the "power of being told lies over and over again by leaders who knew better." *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 26-27. While the more culpable actions of others do not free Mr. Celentano from his own personal responsibility, they do provide context. Mr. Celentano went to the Capitol

naively unaware that larger powers had paved the way for the perfect storm. Once in that storm, he made terrible choices, and he is now a felon because of it.

While Mr. Celentano's sentence will undoubtedly take into account his poor choices, it must also acknowledge other choices he has made. Mr. Celentano never entered the Capitol. He never tried to enter the Capitol. This is particularly important to recognize in light of the fact that, after his interactions with Officer Ellis, Mr. Celentano remained on Capitol grounds for over an hour. He explained that it was impossible to move against the crowds, and to exit the grounds safely by that point. *Id*. at 1168, 1172-73. He could have chosen to continue to follow the crowd and made different choices, but he found restraint.

The jury acknowledged this when acquitting Mr. Celentano of Obstruction of the Electoral College Certification. They clearly believed him when he testified that he didn't intend to be part of a larger plan to stop the count. Instead, he joined a protest that got out of hand, made some terrible choices, but stopped short of entering the Capitol and causing additional damage.

Mr. Celentano, unlike others, has also shown true contrition. At trial, Mr. Celentano repeatedly acknowledged that he was embarrassed and ashamed of his actions, that he feels horrible about his behavior, and that he would never have gone to Washington, D.C. had he known then what would occur that day. *Id*. at 1130, 1156. On the stand, he was honest, truthful, and accountable. Even when subjected to a lengthy, berating cross-examination that spread over two days, Mr. Celentano remained polite and calm. He showed genuine emotion, breaking down at several points. He is a man who has been humbled by his actions and has sat in the embarrassment and shame of this case.

## IV.    Just Punishment, Deterrence and Rehabilitation: Formulating an Appropriate Sentence under § 3553(a)

In evaluating the proper sentence, and one that is sufficient but not greater than necessary, the Court must consider, among other factors, the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(1). Throughout the course of this case, the government has repeatedly cited to other January 6 cases as the baseline for decisions to be made in Mr. Celentano's case, without accounting for any differences in his background or conduct as compared to other January 6 defendants. In considering both the "nature and circumstances of the offense," and Mr. Celentano's "history and characteristics," it is apparent that the *nine year* sentence Probation is recommending would be greater than necessary and would lead to unwarranted sentencing disparities.

The sentencing recommendation from the United States Probation Office is egregious. Probation is essentially asking for a maximum sentence for Mr. Celentano[6], who has no criminal record, went to Washington D.C. on January 6 with the intent to see former President Trump speak, did not bring a weapon or wear any tactical gear, did not go into the Capitol, was acquitted of the Obstruction of an Official Proceeding Charge, and expressed remorse for his actions. If the Court were to follow this recommendation, it would result in unwarranted sentencing disparities. Moreover, Probation's statement that this recommendation takes into account Mr. Celentano's unique history and characteristics, is not born out in its analysis. There is very little information about Mr. Celentano's background or medical history found in the PSR. Probation included a biased statement from Mr. Celentano's ex-partner, but failed to include statements provided by the defense that clearly show there are flaws in her credibility. Probation

---

[6] While Probation claims that this recommendation is at the "low end of the guidelines," the maximum sentence for the 111(a) charge is eight years. Probation's calculation is so high as it is based on a cross-reference to acquitted conduct for a misdemeanor charge.

is even unwilling to admit the clearest truth – that Mr. Celentano has no criminal history. Instead they write that Mr. Celentano, "does not have an extensive criminal history." *See* Sentencing Recommendation.

### a. Other January 6 Sentences

As the Court is well aware, numerous January 6 defendants have already been sentenced and the range of sentences is significant. While each case undoubtedly differs, we wish to highlight two cases that illustrate why the defense's request for 12 months of home detention and community service would not lead to unwanted sentencing disparities.

***United States v. Shane Jason Woods*, 21-cr-476 (APM)**

Mr. Woods pleaded guilty to one count of 18 U.S.C. § 111(a)(1) and one count of 18 U.S.C. § 113(a)(4). According to the government's sentencing submission, Mr. Woods brought a knife with him on January 6, advised other people to bring weapons with them, and "relished the prospect of politicians and other officials being 'Hung.'" *United States v.* Woods, No. 21-cr-476, ECF No. 46, pg. 27. While on Capitol grounds, Mr. Woods rammed into a UCSP Officer from behind, knocked her off her feet and sent her into a barricade. *See id*. at 28. Then, several hours later, Mr. Woods started yelling at members of the media, climbed over barricades, started destroying equipment and, when a Reuters cameraman tried to leave, Mr. Woods, "took a running start and plowed into him, sending [the cameraman] flying off his feet and knocking him and his camera to the ground . . ." *Id*. Further, while on pretrial release, Mr. Woods was arrested and charged with First Degree Murder for an incident involving allegations of drunk driving, a police chase, and a multi-car accident that resulted in a fatality. *See id*. at 21.

Mr. Woods was sentenced to fifty-four months of incarceration. That sentence is half of Probation's recommendation in Mr. Celentano's case. It is the defense's contention that

sentencing Mr. Celentano to anything close to fifty-four months would result in sentencing

disparities. Mr. Woods brought a knife to January 6 and encouraged others to bring weapons. His

messages leading up to January 6 discussed violence and "hanging" of elected officials. As

stated above, Mr. Celentano did not bring any weapons or tactical gear to January 6 and came

with the intention of seeing President Trump speak. Mr. Woods pleaded guilty to two separate

assaults – one on a UCSP officer, and one, several hours after the first assault, on a cameraman.

The entirety of Mr. Celentano's conduct which formed the basis for his convictions occurred

over a period of under three minutes and he was found guilty of one count of assault. Finally, and

importantly, Mr. Woods was arrested and charged with First Degree Murder while on pretrial

release for his case, while Mr. Celentano has not had a single violation while on pretrial release.

Without even taking into account mitigating factors in Mr. Celentano's history and

characteristics, it is abundantly clear that a sentence that is anywhere near Mr. Woods' would

result in sentencing disparities.

### *United States v. Brian Gundersen*, 21-cr-137 (RC)

The defense submits that a sentence closer to, albeit lower than, the eighteen months that

Brian Gundersen received would be appropriate. Mr. Gundersen was found guilty after a

stipulated facts bench trial of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a)(1). In advance of

January 6, Mr. Gundersen posted on social media suggesting that, "he and others 'might be able

to bum rush the [W]hite [H]ouse and take it over." *United States v. Gundersen*, No. 21-cr-137

(RC), ECF No. 44, pg. 5. On January 6, Mr. Gundersen was one of the first protestors to enter

the Capitol through the Parliamentarian door and encouraged other protestors to enter the

Capitol. *Id*. at 9 – 10. After being forced out of the Capitol by police, Mr. Gundersen reentered

the Capitol building. *See id*. at 15. Mr. Gundersen was forced out of the Capitol building again,

and approximately one hour later got into a skirmish with police officers where he rushed a Metropolitan Police Department officer and hit the officer with his arm. *See id.* at 17.

While the physical contact with Officer Kendrick Ellis in Mr. Celentano's case may be seen as more significant than Mr. Gundersen's contact with police, it is important to recognize that Mr. Celentano never went into the Capitol. He never tried. Mr. Gundersen, on the other hand, went into the Capitol not once but twice and encouraged others to do the same. Moreover, his conduct stretched over the course of hours as opposed to the mere minutes in Mr. Celentano's case. While defense counsel for Mr. Celentano is not privy to the statement of reasons for the sentence imposed in Mr. Gundersen's case, we surmise that the Court considered Mr. Gundersen's history and characteristics in conjunction with the nature and circumstances of the offense.

While no two cases are identical, the defense submits that imposing a sentence of twelve months of home incarceration and community service followed by a period of probation is sufficient but not greater than necessary to serve the goals of sentencing and would not cause an unwarranted disparity amongst defendants.

### b.  Lack of Adequate Medical Care at BOP Facilities

As the Court is aware, one factor for consideration under 18 U.S.C. § 3553(a)(2)(D) is the need for the sentence imposed "to provide the defendant with needed…medical care…in the most effective manner." The goal of punishment is to address Mr. Celentano's conduct that he was found guilty of engaging in. Prison will not just incapacitate Mr. Celentano, it risks causing him serious physical harm and guarantees he will suffer intense pain daily. Alternatively, home detention would severely restrict Mr. Celentano's freedom and punish him without posing such risks to Mr. Celentano's health.

17

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ A jail sentence for Mr. Celentano

will be vastly harder than it would be for a healthier person.

The BOP cannot provide Mr. Celentano with adequate medical care. The BOP has been the subject of many reports condemning the treatment that incarcerated people receive. The reality is, the BOP has fallen short of even its own operational goals for medical care. [7] Incarcerated individuals are still stuck standing in line to ask for medical attention that is routinely delayed, and even when received, is subpar.[8] Some facilities lack essential personnel, such as pharmacists, and incarcerated individuals are unable to get their medication.[9] The conditions are, in the words of a staff member at BOP, "unacceptable" and "dangerous."[10]

The Department of Justice issued a report just last year which merits deep concern. Amongst other conclusions, the DOJ found that BOP facilities were unable to provide in-house care for numerous common but specialized medical issues.[11] To make matters worse, off-site appointments at clinics and other facilities were frequently missed as a result of transportation challenges.[12] All of this results in medical care being at best delayed and at worst denied.[13]

---

[7] Federal Bureau of Prisons' Medical Care Falls Short of Its Own Policy, Forbes (April 19, 2022), https://www.forbes.com/sites/walterpavlo/2022/04/19/federal-bureau-of-prisons-medical-care-falls-short-of-its-own-policy/?sh=7af847b75eab.
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *See also* Audit of the Federal Bureau of Prisons Comprehensive Medical Services Contracts Awarded to the University of Massachusetts Medical School, Department of Justice Office of the Inspector General, 1 (March 2022), https://oig.justice.gov/sites/default/files/reports/22-052.pdf.
[12] *Id.*
[13] *Id.*

Either way, BOP is not meeting the needs of the people it is charged with caring for.

███████████████████████████████████████████, are within the top ten most

frequent complaint reports of detained individuals.[14] There are many reasons for this. The

process to get referrals or go outside of the facility for treatment is complicated and unreliable,

so conditions persist and worsen.[15] There is limited access to devices that can help with

stabilization, ████████████████████, for fear that such devices are used as weapons.[16]

The conditions of incarceration restrict the ability to perform home exercises given carceral

facilities are designed to prevent free movement.[17] The conditions of carceral facilities have been

found to exacerbate ███████████ █ ███████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████. There will be no relief for him if he is

detained.

A report published by the U.S. Department of Justice stated that more than one-third of

detained individuals reported that they were not taking their prescription medications.[19] This was

largely because doctors did not think their medication was necessary, or because the facility

[14] Daniela B. Rocha, et al., *Traumatic Orthopedic Injuries in the Prison Population*, 4(4) J. Am. Acad. Orthop. Surg. Glob. Res. Rev. 2 (Apr. 2020) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7188272/pdf/jg9-4-e20.00031.pdf.

[15] *Id.*

[16] *Id.*

[17] The Lancet Rheumatology, *Rheumatology care in prisons: cruel and unusual punishment?*, 2 The Lancet Rheumatology 1 (Dec. 2020) https://www.thelancet.com/action/showPdf?pii=S2665-9913%2820%2930387-8.

[18] Justin D. Strong, et al., *The body in isolation: The physical health impacts of incarceration in solitary confinement*, 15(10) PLoS One 8 (Oct. 2020) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7546459/pdf/pone.0238510.pdf.

[19] *Id.*

would not provide their medication.[20] ███████████████████████████

███████████████████████████████████████████████████

     Mr. Celentano has a complicated medical history and spending time in a carceral facility

will only worsen his conditions. He has ailments that require multidisciplinary care, ████████

███████████████████████████████████████████████████

███████████████████████████████████. In BOP custody,

he will not be able to see the ████████████████████████████████████

████████████████████████

### c.   A Non Incarceratory Sentence is Sufficient But Not Greater than Necessary

People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways as a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.

Hon. Amit P. Mehta, *United States v. Andrew Cavanaugh*, 21-cr-362 (APM),

Sent.Tr. at 29.

     As Judge Mehta stated in another January 6 sentencing, there are many ways that people

are punished. For Mr. Celentano, who at the time of his sentencing will be one day shy of his

56th birthday, and had no criminal record prior to this case, the shame and embarrassment of

being a convicted felon is significant punishment. On top of facing sentencing for his first felony

conviction, Mr. Celentano's name and photograph have been plastered all over the news which

has been another source of humiliation and public ridicule. As Mrs. Celentano states in her letter

---

[20] Laura M. Maruschak & Marcus Berzofsky, *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011–12*, U.S. DEPARTMENT OF JUSTICE BUREAU OF JUSTICE STATISTICS 11 (Oct. 2016), https://bjs.ojp.gov/content/pub/pdf/mpsfpji1112.pdf.

of support, "Ralph's arrest was on the T.V. and in newspapers. It was a shock and embarrassment to the family and friends. Especially since my father was a NYC Police Officer and Ralph was his favorite." Exhibit E, Ltr. of Support, Patricia Celentano. Mr. Celentano's arrest and very public prosecution caused fissures in his relationships with family members, including his children. As stated in the defense's objections to the PSR, Ms. Rossi, the mother of Mr. Celentano's younger children, sent text messages counting down the days until she believed Mr. Celentano would be sentenced to jail time. *See* Exhibit A, at 30. Mr. Celentano feels tremendous guilt that his actions in those minutes on January 6 have affected his family so immensely and changed the course of his life. There are many ways that people suffer, and many ways that people are punished that do not involve a jail sentence, and in Mr. Celentano's case, he has, and will continue to, experience the consequences of his actions. Mr. Celentano's experience from arrest through trial ensures that he will never place himself in the position he was in on January 6 again.

In its sentencing recommendation Probation argues that the recommended sentence "provides some level of protection from the community for the defendant's future crimes," while one paragraph later correctly states that Mr. Celentano is not a "danger to the community." *See* Sentencing Recommendation. Mr. Celentano does not have any prior criminal convictions, and, since he has been on Pretrial Supervision, has not had a single violation. It is apparent that a sentence of incarceration is not necessary to provide any specific deterrence or to protect the public from Mr. Celentano.

The government will undoubtedly cite to general deterrence as a basis for asking for a significant term of incarceration. A sentence of one year of home detention, community service and a period of supervised release is not a slap on the wrist. It is a significant sentence. Curtailing

anyone's freedom and being confined to a home for a year is significant. Further, general deterrence has already been achieved. Every person charged in relation to January 6, including Mr. Celentano, will forever be linked to, and defined by, their actions that day. Their cases have been spread across television screens and newspapers alike. A jail sentence is not the only way to deter others from engaging in like conduct. The public shame, the loss of relationships, the loss of any level of freedom – all of these consequences serve to deter others.

### d.  Conclusion

For the forgoing reasons, we ask the Court to consider a sentence of twelve months of home detention and community service as conditions of probation based on Mr. Celentano's lack of criminal history, medical conditions, and demonstrated remorse.


Respectfully submitted,


____/s/_____
Marissa Sherman
Kathryn Wozencroft
Attorneys for Ralph Joseph Celentano III
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201