**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-186-TJK** |
| **RALPH JOSEPH CELENTANO, III** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

After attacking several police officers on the United States Capitol grounds on January 6, 2023, defendant Ralph Celentano expressed jubilation. "We had the time of our lives."  "It was a day I'll always remember."  "Congress shit their pants today."  "We fought the police and took the whole area over."  "… people have had enough of stolen elections … we are a country that tells other countrys [sic] to overthrow their corrupt government, Americans will not be silenced, this is just the start."  "This is not over first the Capitol hill, now the rest of America."

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Ralph Joseph Celentano, III to 135-months' incarceration, the low end of the Government's calculation of the Sentencing Guidelines range of 135 to 168 months, three-years' supervised release, $2,000 in restitution, and a $300 special assessment.

1

## I.     INTRODUCTION

The defendant, Ralph Celentano, violently participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Celentano was unhappy about the outcome of the 2020 Presidential election and sent text messages and posted on social media to that effect. On January 6th, Celentano traveled from his home in New York, to attend the Stop the Steal rally in Washington, D.C. Afterwards,   he walked to the Peace Monument on US Capitol Grounds – just outside the restricted perimeter.   There, he was video recorded saying, "Someone's gotta do something!"   When asked by someone off camera, "What do you think we should do?"   Celentano replied, "Occupy the Capitol, it's our building."   Celentano then worked his way through thousands of people on the west side of the Capitol to get to the very front of the mob that was confronting a police line.   Celentano shouted at the police, "How dare you pathetic pieces of shit."

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Celentano and other rioters then linked arms and marched straight at the police officers, breaking the police line on the West Plaza.   Celentano used his body weight and momentum to make physical contact with Metropolitan Police Department (MPD) Officer Abdulkadir Abdi, then fought with other officers who had been on the line. Immediately thereafter Celentano chased an unidentified officer for eight to ten feet before shoving that officer.   Most egregiously, Celentano blind-side tackled United States Capitol Police (USCP) Officer Kenrick Ellis from behind. Leading with his shoulder, Celentano slammed his 240 pounds into Officer Ellis's back, lifting Officer Ellis right off his feet and sending him flying over a 5-foot-high ledge, and landing on other persons below.   Those assaults all took place in under two minutes.   Celentano stayed on the West Plaza of the Capitol for at least another 45 minutes.   He recorded a video of the huge mob and triumphantly proclaimed, "We did it boys, we stormed the Capitol.   Here we are, for all to see. A sea of American patriots."

Between January 6 and 10, 2021, Celentano sent text messages and posted on social media bragging about his conduct at the U.S. Capitol on January 6.

A jury convicted Celentano of violating 18 U.S.C. §§ 111(a), 231(a)(3), 1752(a)(1), 1752(a)(2), 1752(a)(4), and 40 U.S.C. § 5104(e)(2)(F).   The jury acquitted him of violating 18 U.S.C. § 1512(c)(2).

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol at the West Plaza

On January 6, 2021, hundreds of rioters, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential

election.   During the joint session of the United States Congress convened at the Capitol, with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades were in place around the exterior of the Capitol, which was closed to the public.

On the West Front of the Capitol grounds, rioters approached the building on January 6, 2021. Rioters fought police over the establishment and reinforcement of a police defensive line on the plaza using fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.

Despite the deployment of riot control agents and impact weapons, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.   By 2:28 p.m., several large gaps appeared in the police defensive line at the West Front and a general retreat was called.   The rioters had seized control of the West Plaza and the inauguration stage.   All proceedings of the United States Congress, including the joint session, were effectively suspended, and the proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol building and grounds.

*Injuries and Property Damage Caused by the January 6, 2021 Attack*

Individuals in the crowd broke windows and assaulted members of law enforcement, as others in the crowd encouraged and assisted those acts.   The rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building.   They caused extensive, and in

4

some instances, incalculable, losses.   This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways.   The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.9 million dollars.

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC),   ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

## B.    Celentano's Role in the January 6, 2021 Attack on the Capitol

The evidence at trial showed that Celentano was unhappy about the outcome of the 2020 Presidential election. Trial Tr. at 1188:21-22.    He sent texts and posted on Parler[2] that Joe Biden wouldn't be President and the "crooked poll workers need to be hauled before judges." *See* Trial Exhibit 1103, 1104, and 1018.

---

[2] A now-defunct American alt-tech social networking service.



**Image 1: Trial Exhibit 1103**

**Image 2: Trial Exhibit 1104**

**Image 3: Trial Exhibit 1018**

On January 6th, Celentano traveled from his home in New York, to attend the former president's Stop the Steal rally in Washington, D.C. He attended the rally with a female companion named Jenny. Trial Tr. at 1140:24-25; 1141:1-2.

6

***Celentano's Approach to the Capitol***

While admittedly "amped up" from the rally, Celentano marched over a mile to the Capitol Building gripping his Trump flag, folding chairs strapped to his backpack, which bore a patch that read, "Kill Them All and Let God Sort it Out." Trial Tr. at 1325:4-15.



**Image 4: Trial Exhibit 1010**

Celentano and his companion walked to the Peace Monument on U.S. Capitol Grounds – just outside the restricted perimeter. Trial Tr. 1313:19-22.   *See* Image 4.   There, he was video and audio recorded by an unknown subject saying, "Someone's gotta do something!" *Id.*   When asked by someone off camera, "What do you think we should do?"   Celentano replied, "Occupy the Capitol, it's our building." *Id; see also* Image 5 and Trial Exhibit 601.



**Image 5: Still from video Trial Exhibit 601**

Thereafter, Celentano worked his way through thousands of people on the west side of the Capitol to the very front of the mob that was confronting the police line on the West Plaza of the building. Trial Tr. 1205:12-20.   There, he shouted at the police, "How dare you pathetic pieces of shit." Trial Tr. 1206:5-11.



**Image 6: Still from video Trial Exhibit 701.1 at timestamp 0:20**

### *Celentano's Attack on Officer Abdi*

Celentano and his fellow rioters then linked arms and marched straight at the line of police officers guarding the Capitol building.   MPD Officer Abdi ordered the rioters back but they didn't comply.   At 2:28:11 p.m. (while Congress was still in session), Celentano made direct contact with Officer Abdi's baton that Abdi held out to keep Celentano from assaulting him.   Celentano's participation in this interaction contributed to the break of the police line on the West Plaza.



**Image 7: Trial Exhibit 701.3**

*Celentano's Attack on Other Officers After Breaching Police Line*

In the ensuing melee with police officers, Celentano pushed and shoved the officers, including putting his hands on their riot shields.   *See* Images 8 and 9.   Open-source videos show Celentano using police riot shields to push on the police as he struggled with them to break the police line.   The shields are over five-feet tall and made of very hard plastic.   *See United States v. Gillespie* 22-cr-60 (BAH), Tr. 12/20/2022 at 78-79.   Celentano used the riot shields both offensively (to push multiple police officers in an effort to get past the police line) and defensively (to obstruct the police from fending him off).



**Image 8, Still from video Trial Exhibit 605 at timestamp 0:10 with circle added**



**Image 9, Trial Exhibit 604.1**

Celentano claimed in his testimony at trial that an officer hit him with a baton as he bent down to pick up his hat. Trial Tr. at 1325: 16-24.   However, the video of Celentano picking up his hat does not support his claim.   *See* video Trial Exhibit 605.

10



**Image 10: Still from video Trial Exhibit 605 at timestamp 0:13, with circle added**

***Celentano's Attack on an Unknown Officer***

In retaliation for allegedly being struck by an unidentified police officer, Celentano chased that officer for eight to ten feet and repeatedly shoved him at 2:28:52-54 p.m. (while Congress was still in session).   *See* Images 1-13 *see also* Trial Exhibits 701.1 and 605.   Trial Tr. at 1326:3-11. The attacks on Officer Abdi and the unknown officer occurred within one minute of each other.



**Image 11: Trial Exhibit 701.5, with circle added**

11



**Image 12: Still from video Trial Exhibit 701.1 at timestamp 1:21, with circle added**



**Image 13: Still from video Trial Exhibit 602 at 0:09**

### *Celentano's Vicious Assault on Officer Ellis*

Celentano moved closer to the Capitol building.   Within 40 seconds of his attack on the

unknown officer, Celentano saw USCP Officer Ellis with his back turned.   At 2:29:33 p.m. (while

Congress was still in session), Celentano charged at Officer Ellis from behind. Leading with his

shoulder and crouching down, he threw his 240 pounds into Officer Ellis's back; Officer Ellis

12

could not see him coming. Trial Tr. at 1334: 1-15.   That blow lifted Ellis right off his feet and

sent him flying over a five-foot-high ledge.   Officer Ellis landed on a group of people on the other

side of the ledge.   Trial Tr. at 856:20-25.   Officer Ellis was wearing his hard riot gear and, as a

result, had difficulty standing up. That left him in a vulnerable position and at great risk of being

trampled by other rioters. Trial Tr. at 857:1-3.   Officer Ellis testified that he served in Iraq but

thought this is how "it was going to end" for him. Trial Tr. at 860:3-11.   He also said that, at that

moment, he feared he would never see his five-year-old son again. *Id.*



**Image 14: Still from video Trial Exhibit 702 at timestamp 2:08**



**Image 15: Still from video Trial Exhibit 602 at timestamp 0:39 with circle added**

This was Celentano's third attack in less than two minutes on a police officer who was attempting to protect the U.S. Capitol Building, United States Senators and Members of Congress, and their staff. Trial Tr. at 1335:1-20.

At trial Celentano testified that Officer Ellis was unjustly hitting someone. Trial Tr. at 1329:8-17.   Officer Ellis testified that the person he was striking when Celentano blind-sided him was choking another police officer. Trial Tr. at 856:1-13. Despite being mere feet away from Officer Ellis, Celentano testified he was unable to see the officer who was being choked but was able to see Officer Ellis striking a rioter with his baton. Trial Tr. 1130:1-24.   Celentano implied that Officer Ellis had not actually seen another rioter choking an officer, and in closing argument the defense unequivocally asserted that Officer Ellis did not see a rioter choking an officer at this point in the day.



**Images 16 and 17: Stills from video Trial Exhibit 602 at 0:34, with arrows added**

A video the government found after the conclusion of the trial clearly corroborates Officer

Ellis's testimony that he was performing controlled baton strikes to assist an officer who was being

choked and assaulted by another rioter. The government has provided that video to the Court and

defense counsel as an exhibit for sentencing and labeled it Sentencing Exhibit 1.



**Image 18: Still from Government video Sentencing Exhibit 1 at 0:28,
with arrow added**

As explained above, Celentano testified at trial that he did not see a rioter choking the

police officer that Officer Ellis was trying to assist. The video evidence, however, contradicts that

testimony. Celentano cravenly and without cause threw his full body weight against Officer Ellis

when that officer was defenseless against that assault. After all, it was at least the third officer

Celentano initiated physical contact with in under two minutes.   And the jury found Celentano

15

guilty of assaulting Officer Ellis; they did not believe Celentano's assertion that he was defending a third party.

### *Celentano Remained in the Restricted Area After His Assaults*

Celentano stayed on the West Plaza of the Capitol for at least another 45 minutes. During that time, he recorded a video of the huge mob and triumphantly proclaimed, "We did it boys, we stormed the Capitol!   A sea of patriots, from sea to shining sea." Trial Tr. at 1338:8-19; *see also* Trial video Exhibit 1005.

Capitol Police Officer Mark Gazelle testified that because Celentano, along with other rioters, remained within the restricted perimeter, Congress was prevented from resuming its certification of the electoral votes for several hours. Trial Tr. 1115:12-21.

### *Celentano's Inflammatory Post- January 6, 2021 Statements*

From January 6 through 10, 2021, Celentano texted others and posted multiple times on Parler. These texts and posts included statements, such as, "Congress shit their pants today." Trial Exhibit 1106. "We fought the police and took the whole area over." Trial Exhibit 1022.   "Me and like 15 guys linked arms and pushed past the police." *Id.*



> **CELENTANO:**
>
> We took the Capitol frank jenny and i fought the Capitol hill police and won we got pepper sprayed tear gassed but we fought and we kicked ass
>
> **1/6/2021 6:17:46 PM**

**Image 19: Trial Exhibit 1019**



**Image 20: Trial Exhibit 1106**



**Image 21: Trial Exhibit 1021**





**Image 22: Trial Exhibit 1107**

**CELENTANO:**

Camile we had the time of our lives even with being pepper sprayed and tear gassed we would do it all over again

**1/7/2021 1:51:58 PM**

**Image 23: Trial Exhibit 1020**

18



**Image 24: Trial Exhibit 1109**



**Image 25: Trial Exhibit 1110**



**Image 26: Trial Exhibit 1111**

**CELENTANO:**

Me and like 15 guys one guys yelled out lock arms and one step at a time till they started hitting us with battons and a couple guys behind them spraying us with pepper spray the it all got wild fighting then we broke thru a line and took that whole area ever

**1/9/2021 2:39:21 PM**

**Image 27: Trial Exhibit 1022**

**CELENTANO:**

It was a day ill always remember

**1/9/2021 2:40:06 PM**

**Image28: Trial Exhibit 1022**



**Image 29: Trial Exhibit 1112**



01-07-2021, 11:45AM

Those who breached the Capitol Building and committed acts of violence have done grave damage in many ways.  This will all need to be sorted out, the violent from the peaceful, but the violent must be punished.  And the media must be careful not to paint everyone with the same broad brush. But make no mistake, the perpetrators must be punished.

Phatsurfdawg · @Phatsurfdawg
01-07-2021 · 👁 31
Thats becouse the will of the people will not be held down by corrupt politicians anymore you call me a bearded hippie a trump hat yep iam and us bearded hippies kicked ass and sent congress and the senate its not their counrty to pillage any more yes they tear gassed us pepper sprayed us used flash bombs against us and WE THE PEOPLE took what was ours back the Capital something antifa and blm couldnt ever do ive never been prouder to be an American as i was standing on the capital

**Image 30: Trial Exhibit 1113**



01-08-2021, 11:48AM

It's Friday, January 8th 2021, and the Obama/Biden administration was the most corrupt in US history.
#Obamagate

Phatsurfdawg · @Phatsurfdawg
01-08-2021 · 👁 31
This is not over first the Capitol hill ,now the rest of America #WeThePeople

**Image 31: Trial Exhibit 1114**



Phatsurfdawg · @Phatsurfdawg
01-10-2021 · 👁 31
The fact they stole the election for the American people they snub their noses at all the evidence , now after tasting fear they want more Capital Hill protection ,on our dime we now have their attention the time is now make your voices be heard from Sea to shining Sea # WeThePeople

**Image 32: Trial Exhibit 1116**

***Celentano's Interview With the FBI***

When interviewed by FBI at the time of his arrest on March 9, 2022, Celentano falsely denied knowing if he was the person who assaulted Officer Ellis, and he asked the FBI agents several times, "is that officer hitting that person [another rioter]?" *See* Government's video Sentencing Exhibit 2 at 46:45.   When the FBI agents asked Celentano if he assaulted Officer Ellis because Celentano believed Officer Ellis was improperly assaulting a civilian,   Celentano evasively changed the subject. *See id.* at 47:05.    Celentano finally admitted during his trial testimony that he had been untruthful with the FBI agents during this interview and that he knew all along that he was the person who tackled Officer Ellis. Trial Tr. at 1349:2-14; 1350:1-19.



**Image 33: Still from Government's video Sentencing Exhibit 2**

## III.    THE CHARGES AND JURY VERDICTS

On May 25, 2022, a federal grand jury returned an indictment charging Celentano with seven counts, including Count 1: Assaulting, Resisting, Impeding Certain Officers, in violation of 18 U.S.C. 111(a)(1); Count 2: Civil Disorder, in violation of 18 U.S.C. 231(a)(3); Count 3: Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. 1752(a)(1); Count 4: Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of

18 U.S.C. 1752(a)(2); Count 5: Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. 1752(a)(4); Count 6: Act of Physical Violence in a Capitol Grounds or Buildings, in violation of 40 U.S.C. 5104(e)(2)(F); and Count 7: Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. 1512(c)(2) and 2. Following a trial before this Court, a jury convicted Celentano on June 12, 2023 of Counts 1 through 6. The jury acquitted Celentano on Count Seven, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. 1512(c)(2) and 2.

### *Celentano's False Trial Testimony*

Celentano testified in his own defense at trial and made multiple false statements.

First, Celentano had over two years to manufacture his testimony, which resulted in his answering questions on direct examination in a straightforward manner but engaged in obfuscation during cross examination; Celentano's testimony was not credible.

Second, by his own admission, Celentano was untruthful when he was questioned on March 9, 2022, by the FBI. (Tr. 6/9/2023, page 1349, lines 2-22, and page 1350, lines 1-19.)

Celentano's false statements including the following: Trial Tr. 1128-1350

- He didn't identify himself during his post-arrest interview with the FBI because he did not have his glasses on during the interview. Trial Tr. 1346:11-22; 1347:17-25. In fact, in his custodial interview, Celentano had his glasses and put them on to view the video. See Government Exhibit 2 at 46:20. The government played that video for Celentano to impeach his assertion that he did not have glasses with him. Trial Tr. 1348:3-25. Celentano then admitted that he was untruthful during his initial testimony and during his March 9, 2022 interview with the FBI. Trial Tr. 1349:2-14.

- He was embarrassed about his actions at the Capitol as early as the night of January 6. Trial Tr. 1178:1-22.  In fact, the texts and posts he made that same night and over the following days demonstrated zero remorse and that Celentano was actually boasting about his conduct. Trial Tr. 1182:15-20.  When confronted with these statements, Celentano claimed that he didn't want to look like a "crybaby," so he just said those things to seem "cool." Trial Tr.

23

1179:8-21.   When further pressed on cross-examination, Celentano admitted that no one forced him to send any of the texts or post anything on social media, and that what he wrote wasn't a choice between bragging or being truthful. Trial Tr. 1187:3-9.   It was apparent that Celentano was not being truthful when he claimed to have been embarrassed as early as the night of January 6. Trial Tr. 1182:15-20.

- He didn't leave the Capitol because there were too many people. Trial Tr. 1204:12-21.   On cross-examination, Celentano admitted to getting past "tens of thousands" of people to make it to the front of the police line, and that he had not even tried to leave the Capitol.

- The reason he assaulted Officer Ellis was because he was "defending" another rioter that Officer Ellis was striking with a baton.   In fact, during the FBI custodial interview, when viewing the video of his assault on Officer Ellis, Celentano asked the FBI agent, "is that officer hitting that person?" *See* Government Exhibit 2 at 46:55. Celentano's question makes clear that the supposed reasoning for his actions was developed in preparation for trial. During the interview, the Defendant never indicated he had rammed Officer Ellis in defense of another.

- He was twenty to thirty feet away when he first observed Officer Ellis and could see the police and rioters "armpits and above." Trial Tr. 1329:3-10.   But he contradicted that testimony when he testified that he was unable to see that the rioter was wearing a gas mask or that the rioter had another officer in a chokehold. Trial Tr. 1330:1-25. Open-source media clearly shows the rioter's actions and to the extent Celentano could observe him, his testimony is not consistent with either what actually occurred or what he had previously testified he could observe.

- Celentano testified that he didn't hear any speakers at the rally, because the crowd was so loud, but when Trump spoke everyone quieted down. Trial Tr. 1194:18-25; 1195:1.   Celentano on one hand admitted to listening to Trump's speech during the "Stop the Steal Rally on January 6th,  but yet never heard him mention Vice President Pence or the electoral certification. Trial Tr. 1195-1197.   A review of a transcript of former President Trump's speech reveals several references to former Vice President Pence and the electoral certification. *See* Sentencing Exhibit 2. When confronted with those statements, Celentano testified that the crowd may have cheered at those exact moments and so he couldn't hear and was therefore unaware of the electoral certification on January 6, 2021. Trial Tr. 1196:3-9, 18-25.

- While walking from the Peace Monument along the Pennsylvania Walkway and up to the West Plaza of the Capitol Building, he did not know that area was restricted and he did not encounter or see a single bike rack, Area Closed sign, or snow fencing – even those knocked over on the ground. Trial Tr. 1199:21-25; 1201:1-9. Capitol Police witnesses testified regarding the numerous Area Closed signs and bike racks and snow fencing in that area.   Even if the security restrictions had been knocked down, it is inconceivable that Celentano would not have seen those items on the ground while walking past them. Additionally, there is a picture of Celentano and Jenny in front of the Area Closed sign at the Peace Circle.   *See* Image 4 above.

While he did not cross that barrier onto the monument, that certainly put him on notice that he was at or near a restricted area.

- He did not observe a single individual throwing objects or projectiles at the police line or physically striking the officers. Trial Tr. 1316:11-20. Based on surveillance footage of the area as well as scenes where the defendant is present, that is demonstrably false. *See* Trial Exhibit 602.

- Celentano claimed he knew Congress was meeting on January 6, 2021, but he did not know they were meeting to certify the Electoral College votes.   While the jury acquitted Celentano of Count Seven, the trial evidence proved, at least by a preponderance, that Celentano did know the reason Congress was meeting.   Celentano was upset about the outcome of the 2020 election, but took no action until January 6, 2021, or anywhere other than the Capitol regarding his ire. Trial Tr. at 1188:21-22. He attended the *Stop the Steal* rally that was directly related to the 2020 election and was present during former President Trump's speech that, on multiple occasions, directly referenced former Vice President Pence and his role in certifying the election. Trial Tr. at 1140:24-25; 1141:1-2; Tr. 1195-1197. While at the Peace Circle, Celentano was video recorded saying, "Someone's gotta do something!"  When asked by someone off camera, "What do you think we should do?"  Celentano replied, "Occupy the Capitol, it's our building." Trial Tr. 1313:19-22; *see also* Trial Exhibit 601.   Approximately two hours later he recorded the video triumphantly proclaiming, "We did it boys, we stormed the Capitol!" Trial Tr. at 1338:8-19.  His texts and Parler posts included claims such as, "Congress shit their pants." Trial Exhibit 1106.  Celentano also testified that he regularly watched three news channels, and that he watched CSPAN regularly (so much so, that he knows Congress starts their session by "striking the gavel"). Trial Tr. at 1340:20-25.   He admitted the news stations covered the election and its outcome. *Id*; Trial Tr. at 1341:1-2 Celentano fought police in his effort to "occupy the Capitol."   It is unimaginable that Celentano would have taken the actions he did and made the statements he did if he did not know the reason Congress was meeting on January 6, 2021 to certify the election results.

## IV.    STATUTORY PENALTIES

The statutory maximum sentences for each count of conviction are noted in paragraphs 109 to 114

of the Presentence Report ("PSR") issued by the U.S. Probation Office.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. Id. at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id*. at 49.

The PSR does not include a Guidelines analysis for all counts.[3]   The government has calculated Celentano's Guideline calculations as follows:

**Count One: 18 USC § 111(a)(1), Assaulting, Resisting or Impeding Certain Officers (Assault of USCP Officer Kenrick Ellis)**

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic - Physical Contact | +3 | U.S.S.G. § 2A2.4(b)(1)(A) Celentano made physical contact with Officer Ellis. |
| Cross-Reference: | | U.S.S.G. §2A2.4(c) – if the conduct constituted aggravated assault, apply §2A2.2 Celentano's conduct was aggravated assault because it was committed with the intent to commit another felony, namely Civil Disorder charged in Count Two. *See* U.S.S.G. § 2A2.2, cmt. n.1(D) (definition of aggravated assault). |

---

[3] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.   The PSR does not follow these steps. It concludes the six counts for which Celentano was convicted fall into two groups (see PSR ¶¶ 44 - 64) but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
|---|---|---|
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." <br><br> The evidence showed Officer Ellis was a Capitol Police Officer working in his official capacity on January 6, 2021.   Officer Ellis was clearly identifiable as a police officer. He was wearing full USCP riot gear, including a helmet that said, "U.S. Capitol Police." Celentano was also motivated by Officer Ellis' status as a police officer, as he blindsided Officer Ellis and knocked him off the five-foot high ledge to stop Officer Ellis from doing his duty of protecting and defending the Capitol.   Additionally, the applicable Chapter Two guideline is 2A2.2, which is from Chapter Two, Part A (Offenses Against the Person) of the U.S.S.G. |
| Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." <br><br> As explained above, Celentano repeatedly testified falsely at trial about material matters that were designed to substantially affect the outcome of the case.   Accordingly, the Chapter 3 adjustment for obstruction of justice applies in the instant case. See U.S.S.G. §3C1.1 n.4(B); *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) |
| **Total** | | **22** |

*Two-Level Upward Adjustment for Obstruction of Justice*

Pursuant to U.S.S.G.  § 3C1.1 (Obstructing or Impeding the Administration of Justice), the offense level should be increased by two levels if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice," including by providing "materially false testimony" during trial.  U.S.S.G.  § 3C1.1, n.4.

At trial, he testified untruthfully about material matters that were designed to substantially affect the outcome of the case.  Accordingly, the Chapter 3 adjustment for obstruction of justice applies in the instant case.[4]  *See United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (holding that the commission of perjury is of obvious relevance to determining appropriate type and extent of punishment after issue of guilt has been resolved, because it reflects on defendant's criminal history, on her willingness to accept commands of law and authority of court, and on her character in general).

**Count Two: 18 U.S.C. § 231(a)(3), Interfering with Law Enforcement Officials During a Civil Disorder (Obstructing, impeding, and interfering with the police on the West Plaza of the Capitol, specifically MPD Officer Abdi and multiple other officers as Celentano broke the police line, and the unknown officer Celentano chased down to attack in retaliation for supposedly hitting Celentano with a baton).**

---

[4] Courts in this district, including this Court, have found that USSG §3C1.1 applied in several of other January 6 cases.  *See e.g.*, *United States v. Guy Reffitt*, 21-cr-32 (DLF); *United States v. Thomas Robertson*, 21-cr-34 (CRC); *United States v. Thomas Webster*,. 21-cr-208 (APM); *United States v. Hale-Cusanelli*, 21-cr-37 (TNM); *United States v. Christian Secor*, 21-cr-157 (TNM); *United States v. Matthew Bledsoe*, 21-cr-204 (BAH); *United States v. Mark Andrew Marza*, 21-cr-736 (JEB); *United States v. Dustin Thompson*, 21-cr-736 (JEB); *United States v. Mathew Wood*, 21-cr-223 (APM); *United States v. William Reid*,  21-cr-316 (DLF); *United States v. Tommy Allan Frederick*, 21-cr-64 (CKK); *United States v. Ronald Sandlin*, 21-cr-88 (DLF); *United States v. Erik Herrera*, 21-cr-619 (BAH); *United States v. Vincent Gillespie*, 22-cr-60 (BAH): and *United States v. St Cyr*, 21-cr-185 (JDB).

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline." U.S.S.G. §2X5.1. Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Physical Contact/Dangerous Weapon | +3 | U.S.S.G. § 2A2.4(b)(1)(A) and (B) Celentano made physical contact with Officer Abdi. In addition, Celentano possessed a dangerous weapon, the police riot shields and its use was threatened. |
| Cross-Reference: | | U.S.S.G. §2A2.4(c) – if the conduct constituted aggravated assault, apply §2A2.2 See analysis regarding Count One. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Official Victim | +6 | U.S.S.G. § 3A1.2(a), (b) The evidence showed that when Celentano attacked the line of police officers they were working in their official capacity, including Officer Abdi who was working in his official capacity of an MPD officer. The officers, including Officer Abdi, were clearly identifiable as police officers, as they were wearing full police riot gear. Celentano was also motivated by the officers' status as police officers, as he attacked the line, including Officer Abdi, to stop them from doing their duty of protecting and defending the Capitol.   Additionally, the applicable Chapter Two guideline is 2A2.2, which is from Chapter Two, Part A (Offenses Against the Person) of the U.S.S.G. |
| Obstruction of Justice | +2 | U.S.S.G. § 3C1.1 See analysis regarding Count One |
| Brandishing a Dangerous Weapon | +3 | U.S.S.G. §2A2.2(b)(2)(C): a "dangerous weapon was brandished or its use was threatened." Celentano used the size and weight of the police riot shields as leverage to offensively push against the officers guarding the Capitol Building. The police shields are hard, plastic, and more than five feet tall and Celentano's actions with them when viewed from the perspective of an officer-victim were intended to cause bodily injury. Celentano viewed ramming through that police line as essential to get closer to the Capitol building (as the video recording showed Celentano wanted to "occupy the Capitol" and he felt the mission |

| | | |
|---|---|---|
| | | was accomplished when he recorded a video saying, "we did it boys, we stormed the Capitol"). |
| **Total** | **25** | |

### Three-Level Upward Enhancement for Brandishing a Dangerous Weapon

Guidelines Section 2A2.2(b)(2)(C) provides for a three-level increase in the offense level if a dangerous weapon was brandished or its use was threatened.   Application Note 1 states that "dangerous weapon" "has the meaning given that term in §1B1.1, Application Note 1, and includes any instrument that is not ordinarily used as a weapon (e.g., a car, a chair, or an ice pick) if such instrument is involved in the offense with the intent to commit bodily injury."   The intent to do bodily injury is not measured by Celentano's subjective motivation but rather what a person in that victim officer's position might reasonably conclude from the assailant's visible conduct. *See United States v. Nunez-Granados*, 546 Fed. Appx. 483, 486 (5th Cir. 2013). Section 1B1.1, Application Note 1, states that "'Dangerous weapon' means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (*e.g.*  a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun)."

Here, Celentano used police riot shields both offensively, to ram and charge against multiple police officers and to get past the police line.   *Supra at* pages 17 - 18 (Trial Exhibits 605, 607.1, and 604.1). Notably, Celentano did **not** use the riot shield solely in a defensive fashion. If he had, Celentano would have remained stationary or even retreated from the police line. *See* Image 36 showing an unidentified rioter remaining stationary while holding up a wooden pallet at

the Northwest Stairwell to block less-lethal projectiles fired by the Capitol Police. As noted above, Celentano used the riot shield's size and weight as leverage against the police officers in attempt to ram through them and clear the way for additional rioters to break the police line. Given the chaotic nature of the scene and because the officers were wearing the Civil Disturbance Unit "turtle" gear (Trial Tr. 857:1-3), the risk of being trampled by Celentano or other individuals was high.   The shields are over five-feet tall and made of a very hard plastic material *See United States v. Gillespie* 22-cr-60 (BAH), Tr. 12/20/2022 at 78-79, which when used to charge the police, were capable of causing serious bodily injury, as defined in U.S.S.G §1B1.1.   *See* Images 8 and 9 above.



**Image 34: still image taken from video trial exhibit 304 in *United States v. Christopher Alberts, 21-cr-26*, which shows a rioter using a wooden pallet defensively**

Other courts have found that police riot shields, wielded by January 6 defendants, could be considered "dangerous weapons" depending on how they were used, within the meaning of U.S.S.G.  §2A2.2(b)92)(B).   *See, e.g.,* in *United States v. McCaughey, III et al*, 21-cr-40-TNM, (Tr. 09/13/2022 at 23, 26); *United States v. Vincent Gillespie*, Case No. 22-cr-60 (BAH), (Tr.

04/14/2023 at 28-29, 48);   *See also* PSR (ECF No. 83) at ¶¶   11 and 52.

Courts have determined that objects such as a car (*see United States v. Dayea*, 32 F.3d 1377 (9th Cir. 1994)); plastic water pitcher (*see United States v. Tolbert*, 668 F.3d 798 (6th Cir. 2012)); and shoes (*see United States v. Velasco*, 855 F.3d 691 (5th Cir. 2017)) were dangerous weapons under particular circumstances.   Similarly, here, the police riot shields used by Celentano were "dangerous weapons" under the facts of this case, and therefore the Section 2A2.2(b)(2)(C) enhancement applies.

**Count Three: 18 U.S.C. § 1752(a)(1), Entering and Remaining on a Restrict Building or Grounds**

**The Statutory Index lists two guidelines for this offense, U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and § 2B2.3 (Trespass).  Since Section 1752(a)(1) is a trespass statute, § 2B2.3, it is "the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." Appendix A, Introduction.**

| | | |
|---|---|---|
| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) |
| Specific offense characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds."<br><br>On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross Reference | | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." Although Celentano was acquitted of *actually violating* 18 U.S.C. § 1512(c)(2) as charged in Count Seven, the trial evidence was sufficient to prove, by a preponderance, that he *intended* to obstruct a proceeding before Congress, to wit: the January 6, 2021 Congressional certification of the 2020 Electoral College vote for President. |
| Base Offence Level | 14 | U.S.S.G. §2J1.2 |
| Specific offense characteristic | +8 | U.S.S.G. §2J1.2(b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or |

|  |  | property damage, in order to obstruct the administration of justice."

For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which, in the Capitol riot cases, refers to a "proceeding before the Congress," as defined in § 1515(a)(1)(B).

There are multiple bases to apply this offense characteristic based on U.S.S.G. § 1B1.3 which encompasses (a) the defendant's own acts or omissions and (b) those whom the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused. It also includes "all harm that resulted" from the defendant's acts or the acts of others engaged in jointly undertaken criminal activity with the defendant. § 1B1.3(a)(3).

As described in the conduct section above, Celentano's statements before, on, and after January 6, 2021, reveal he intended to obstruct Congress. Attacking the officers, the police line, and ultimately assaulting Officer Ellis were all in furtherance of his attempts to thwart the certification of the Electoral College vote. He threatened physical injury to several officers, including named assault victim Officer Ellis in Count One, as well as Officer Abdi and other officers attacked at the Capitol in Count Two. Celentano's texts, posts, and on-camera statements show his purpose was to "occupy the Capitol," "take back what is ours," "we did it, we stormed the Capitol," "people have had enough of stolen elections … we are a country that tells other countrys [sic] to overthrow their corrupt government, Americans will not be silenced, this is just the start," and "This is not over first the Capitol hill, now the rest of America."

In addition, Celentano's actions aided others, so their conduct was part of Celentano's relevant conduct.  *See* U.S.S.G. § 1B1.3(a)(1)(A). First, he linked arms with other rioters, thereby assisting in charging and breaking the police line on the West Plaza. When Celentano |
|---|---|---|

| | | |
|---|---|---|
| | | assaulted Officer Ellis while he was trying to stop another rioter from choking another police officer, Celentano stopped Officer Ellis from protecting the other officer. And while still on the West side of the Capitol, proclaiming, "we did it boys, we stormed the Capitol" he was encouraging those around him to continue their riotous behavior. |
| Specific offense characteristic | +3 | U.S.S.G. §2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice."<br><br>For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress, § 1515(a)(1)(B).<br><br>The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted for almost six hours while legislators were physically evacuated for their own safety.[5] |
| Official Victim | +6 | U.S.S.G. § 3A1.2(c): "in a manner creating a substantial risk of serious bodily injury," the defendant "knew or had had reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense."<br><br>Celentano blind-side tackled Officer Ellis with such force that he was knocked over a five-foot high ledge, where Officer Ellis landed on the ground, had difficulty getting to his feet, and put him in the position of being trampled – this created a substantial risk of serious bodily injury.<br><br>As noted above, Officer Ellis was also clearly identifiable as a police officer. He was wearing full USCP riot gear, including a helmet that said, "U.S. Capitol Police." |
| Adjustment | +2 | U.S.S.G. §3C1.1:<br>Celentano provided materially false testimony under oath, as detailed above. *See* U.S.S.G. §3C1.1 n.4(B). |
| **Total** | **33** | |

---

[5] *See, e.g., United States v. Calhoun*, 21-CR-116; *United States v, Reffit*, 21-cr-32.

**Cross Reference U.S.S.G. §2B2.3(c)(1)**

The cross-reference under U.S.S.G. § 2B2.3(c), which applies when the offense is committed with the intent to commit another felony, applies here. Despite his acquittal on Count Seven, where proof beyond a reasonable doubt was required, this Court should find, by the applicable preponderance standard,[6] that the evidence shows Celentano's conduct before, on, and after January 6 was all intended to further his goal of obstructing Congress's certification of the election, conduct that constitutes a violation of 18 U.S.C. § 1512(c)(2).

The evidence at trial established by at least a preponderance that Celentano attempted to, and did, knowingly obstruct an official proceeding. Celentano was fully aware that the Electoral College Vote was set to take place inside the U.S. Capitol on January 6, 2021. As set forth above and shown at trial, leading up to January 6, Celentano sent texts and posted on Parler that Joe Biden wouldn't be President, "crooked poll workers need to be hauled before judges" and "we

---

[6] Despite considering a proposed amendment that would have prohibited the use of acquitted conduct in applying the Guidelines, this year, the Commission decided not to adopt that amendment. Thus, acquitted conduct remains an appropriate consideration in applying the Guidelines. *See* U.S. Sentencing Comm'n, Proposed Amendments to the Sentencing Guidelines 211 (Feb. 2, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendlyamendments/20230201_RF-proposed.pdf; U.S. Sentencing Comm'n, Amendments to Sentencing Guidelines (Apr. 27, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf. *See also United States v. Watts*, 519 U.S. 148, 156 (1997) ("an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof."); *United States v. Jones*, 744 F.3d 1362, 1369 (D.C. Cir. 2014) (citing, *e.g., United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[B]inding precedent of this court establishes that" "sentencing based on acquitted conduct" and "enhancing a sentence within the statutory range based on facts found by the judge, as opposed to the jury, do[ ] not violate the Sixth Amendment.").

must take back what is ours, if our elected officials won't we will do it ourselves." Celentano knew that Congress was meeting on January 6, 2021 and would be in session. Trial Tr. at 1340:3-5. Celentano regularly watched various news channels, including C-SPAN. Trial Tr. at 1340:20-25. He confirmed those news channels were covering the 2020 Presidential Election. *Id*; Trial Tr. at 1341:1-2:

Despite this knowledge, after leaving the "Stop the Steal" rally, Celentano joined the mob in corruptly storming the Capitol. Before entering restricted Capitol grounds, he stood on non-restricted grounds by the Peace Circle and stated, "Someone's gotta do something!"   When asked by someone off camera, "What do you think we should do?"   Celentano replied, "Occupy the Capitol, it's our building."   Then he entered the restricted perimeter by at least 2:27 p.m. on January 6, prior to the time the houses of Congress recessed. There, he attacked several officers, including Officer Abdi, then used a riot shield to push officers, then chased down another officer, and finally tackled Officer Ellis from behind.   Within seconds of Celentano's attack on Officer Ellis, the House of Representatives recessed. While still on Capitol grounds, Celentano proudly proclaimed, "We did it boys, we stormed the Capitol!"

As Capitol Police Officer Mark Gazelle testified, because Celentano, along with other rioters remaining on the Capitol grounds, Congress was prevented from resuming its certification of the electoral votes for several hours.   (Tr. 6/8/2023, p. 1115, lines 12-21.)

On January 6 and in the subsequent days, Celentano communicated via Parler and in text messages, stating "Me and like 15 guys linked arms and pushed past the police."   "We had the

time of our lives."  "It was a day I'll always remember."  "Congress shit their pants that day."
"We fought the police and took the whole area over."

Thus, Celentano knew the natural and probable consequences of his conduct would be to
obstruct and delay the proceeding and he willfully engaged in that conduct.   All this shows, by at
least a preponderance of the evidence, that Celentano knowingly committed the offense charged
in Count Seven with intent to obstruct the certification proceeding on January 6, 2021.

This Court would not be the first to apply the U.S.S.G. § 2B2.3(c) cross-reference based
on the acquittal of a § 1512(c)(2) count.   Just like Celentano, defendant Kenneth Joseph Thomas
was convicted of civil disorder (§ 231), assaulting police (§ 111(a)), and remaining is a restricted
building or grounds (§ 1752(a)(1)), yet was acquitted of obstruction of an official proceeding.   In
that case, the government sought a cross-reference to U.S.S.G. § 2B2.3(c), which the court granted.
*See United States v. Thomas*, 21-cr-00552 (DLF).   Similarly, other judges in this district have
applied the U.S.S.G. § 2B2.3(c) cross-reference based on similar conduct, even when the
underlying 18 U.S.C. § 1752(a)(1) offense was a misdemeanor (although the defendants in those
cases were not  acquitted of § 1512(c)(2)). *See, e.g., United States v. Anthony Williams*, 21-cr-
00377 (BAH), 9/16/2022 Sentencing Tr. at 49-51 (defendant also found guilty of § 1512(c)(2));
*United States v. Bledsoe*, 21-cr-00204 (BAH), 10/21/ 2022 Sentencing Tr. at 76-78 (defendant also
found guilty of § 1512(c)(2)); *compare with United States v. Nicholas Rodean*, 21-cr-00057
(TNM), 10/26/2022 Sentencing Tr. at 5-11 (defendant not charged with § 1512(c)(2); court
declined to apply the § 2B2.3(c) cross-reference to the § 1752(a)(1) misdemeanor conviction based
on the case-specific facts—where in the court's assessment, the defendant did not intend to

obstruct—but noted, "I think in many situations with many individuals the sum of the various pieces of evidence that the Government put forth at trial would certainly make out the guideline for obstruction of administration of justice [under the cross-reference]"). As succinctly explained by Chief Judge Howell in *Bledsoe*:

> The guideline at 2B2.3 applies to Count 2, charging: Entering and remaining in a restricted building or grounds, under 18 U.S.C. Section 1752(a)(1). This guideline provides a base offense level of 4 under the Guideline at Section 2B2.3(a). Two offense levels are added because the trespass occurred at a restricted building or grounds, under the Guideline at 2B2.3(b)(1)(A)(vii). It is then adjusted up to 25 offense levels pursuant to the guideline at 2B2.3(c)(1) and 2X1.1(a) because the offense was committed with the intent to commit the felony obstruction offense which adds up to 25 offense levels [pursuant to U.S.S.G. §2J1.2(a)] [. . .].

*United States v. Bledsoe*, 21-cr-00204 (BAH), 10/21/ 2022 Sentencing Tr. at 76-77 (defendant also found guilty of § 1512(c)(2)).

As in these other cases, § 2X1.1(a) applies, and so the base offense level is determined by application of § 2J1.2, as set forth in the chart relevant to Count Three above.

**Count Four: 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds**

**The Statutory Index lists two guidelines for this offense, U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and § 2B2.3 (Trespass). Since Section 1752(a)(2) involves disorderly and disruptive conduct, § 2A2.4, it is "the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." Appendix A, Introduction.**

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Specific offense characteristic - physical contact and dangerous weapon | +3 | Pursuant to U.S.S.G. § 2A2.4(b)(1)(A) and (B)<br>See discussion regarding Count Two. |
| Cross Reference | | Pursuant to § 2A2.4(c), "If the conduct constituted aggravated assault, apply 2A2.2 (Aggravated Assault)." |

| | | See analysis above regarding Count Two. |
|---|---|---|
| Base Offense Level | 14 | |
| Adjustment | +3 | U.S.S.G. §2A2.2(b)(2)(C): a "dangerous weapon was brandished or its use was threatened." See analysis regarding Count Two. |
| Adjustment | +2 | U.S.S.G. §3C1.1 See analysis above regarding Count One. |
| **Total** | **19** | |

**Count Five: 18 U.S.C. § 1752(a)(4), Engaging in Physical Violence in a Restricted Building or Grounds (use of physical violence against Officer Ellis on the Restricted Grounds)**

  The Statutory Index lists two guidelines for this offense, U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and § 2B2.3 (Trespass). Since Section 1752(a)(4) involves physical violence against a police officer, § 2A2.4, it is "the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." Appendix A, Introduction.

| Base Offense Level | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic - Physical Contact | +3 | U.S.S.G. § 2A2.4(b)(1)(A) Celentano made physical contact with Officer Ellis. |
| Cross Reference | | § 2A2.4(c)(1) (Aggravated Assault) See analysis above regarding Count One. |
| Base Offense Level | 14 | § 2A2.2(a) |
| Official Victim | +6 | U.S.S.G. § 3A1.2(a), (b) See analysis regarding Count One. |
| Adjustment | +2 | U.S.S.G. §3C1.1 See analysis above regarding Count One. |
| **Total** | **22** | |

**Count Six: Act of Physical Violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F) (physical violence against Officer Ellison the Capitol Grounds or Building).**

| Base Offense Level: | n/a | Because this offense is a Class B misdemeanor, the Guidelines do not apply to it. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9. |
|---|---|---|

**Grouping**

Based solely on the identity of the victims, there are three groups:

Group One: Counts One and Five, the victim is Officer Ellis.

Group Two: Counts Three and Four: the victim is Congress.

Group Three: Count Two: the victims are Officer Abdi and the other officers who were impeded on the West Plaza.

Under U.S.S.G. § 3D1.2(c) Counts One, Three, and Five group because each "embody conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the count." Here, Celantano's assaultive conduct against Officer Ellis (Counts One and Five) embodies conduct that is treated as the six-level adjustment under U.S.S.G. 3A1.2(c), an assault against a police officer that created "a substantial risk of serious bodily injury," in Count Three. Additionally, Celantano's assault on Officer Ellis *and* his assaultive conduct against Officer Abdi and the other officers on the West Plaza (Count Two) both embody conduct that is treated as the eight-level enhancement under U.S.S.G. § 2J1.2(b)(1)(B), an "offense involved causing or threatening to cause physical injury to a person … in order to obstruct the administration of justice." However, under U.S.S.G. § 3D1.2, cmt. n.5, where, as here, there are "several counts, each of which could be treated as an aggravating factor to another more serious count," "only the count representing the most serious of those factors is to be grouped with the other count." That means that only Count One, whose conduct serves as a basis for the eight-point enhancement under U.S.S.G. § 2J1.2(b)(1)(B) and the six-point adjustment under U.S.S.G. §

3A1.2(c) for a "substantial risk of serious bodily injury" to a victim, groups with Count Three under U.S.S.G. § 3D1.2(c).

Additionally, the conduct in Count Two (Celentano's attack with the riot shield, a dangerous weapon) serves as a specific offense characteristic for Count Four, specifically, the three-point enhancement under U.S.S.G. §2A2.2(b)(2)(C), brandishing or threatening the use of a dangerous weapon.

Accordingly, all counts group.

Under U.S.S.G. § 3D1.3(a), the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group, is the applicable offense level.   Accordingly, the applicable offense level for the group is the offense level for Count Three, or an offense level of 33. Since there is only one group, the offense level is not increased.   *See* § 3D1.4.

The sentencing range for a level 33 and criminal history category I is 135-168 months.

### *Zero Criminal History Category Points*

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1(a)(3) states that it applies if, *inter alia*, "the defendant did not use violence or credible threats of violence in connection with the offense." U.S.S.G. § 4C1.1(a)(3). As the jury convicted Celentano of assault on Officer Ellis in violation of 18 U.S.C. § 111(a), he is disqualified from obtaining the benefit of § 4C1.1.

Further, the Court should not apply § 4C1.1 here for the additional reason that the January 6 riot was a violent attack.   Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Celentano's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Celentano worked his way through thousands of people at the Capitol to get to the very front of the police line.   There, he was part of the group of rioters that

broke through the police line on the Lower West Plaza.   He attacked multiple officers, culminating with an assault of Officer Ellis.   That day, and on subsequent days, he bragged and gloated about his criminal conduct.   The nature and circumstances of Celentano's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 135-months' incarceration.

### B.  The History and Characteristics of the Defendant

Celentano was 54 years old at the time he committed the crimes for which he is currently before this Court.   He previously worked as a carpenter and is currently collecting worker's compensation.   *See* PSR (ECF No. 83) at   ¶¶ 97-98.   He reports no mental or emotional health problems.   *Id*. at ¶ 91   Celentano has a relationship with his mother, had a relationship with his father from adulthood until his father's passing, and has been in a steady domestic partnership since 2013.   *Id*. at ¶¶ 72-74, 78.   There is no indication of any physical or emotional abuse during Celentano's childhood.

Celentano's conduct on January 6, 2021 demonstrates a violent character and disrespect for law enforcement, which weighs in favor of a lengthy term of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

This factor supports a lengthy sentence of incarceration.   On January 6, 2021, at the United States Capitol, Celentano called the officers protecting the building and our democracy, "pathetic pieces of shit" before physically attacking multiple police officers.   Without provocation, Celentano charged Officer Ellis from behind giving no chance to protect himself and shoved him over a ledge.   On January 6, while still at the Capitol, Celentano gloated that, "we did it boys, we

stormed the Capitol."   Once no longer at the Capitol, but still in Washington, D.C., on January 6 and in the following days, Celentano gloated in text messages and on social media: "Congress shit their pants today" "We fought the police and took the whole area over" "We had the time of our lives" and "It was a day I'll always remember."

Additionally, when interviewed by the FBI after his arrest in March 2022, he lied to them. Celentano's criminal conduct on January 6, his statements in the following days, and his behavior when interviewed by the FBI was the epitome of disrespect for the law.

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, Celentano's back injury did not deter him from walking over a mile from the Ellipse to the Capitol, working his way through thousands of rioters to the front of the police line, shoving multiple police officers, and then viciously tackling Officer Ellis.

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

Second, far from expressing any remorse for his violent conduct on January 6, Celentano's social media statements and text messages after January 6 were those of a man who was proud of the havoc he had caused.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home.   It came when he realized he was in trouble.   It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did.   And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).   Celentano's, like Mazzocco, remorse did not come when he left the Capitol. Celentano's own statements demonstrate he had no remorse within the days after January 6:   "We had the time of our lives."   "It was a day I'll always remember."   "Congress shit their pants that day."

Nor did he express any remorse when he was interviewed by the FBI over a year after his criminal conduct.   In that interview, Celentano would not even identify himself in the video agents showed him.

Further, despite his claims of remorse at trial, Celentano did demonstrate remorse on social media just weeks before his trial, as seen on his X (formerly Twitter) account.   Celentano's posts demonstrate he had not accepted the outcome of the 2020 Presidential election more than two years after his crime, and that he is frustrated with other January 6 defendants being incarcerated (held accountable) for their actions.



**Image 34: X (Twitter) repost on April 24, 2023**

**Image 35: X (Twitter) repost on May 2, 2023**

Finally, any remorse Celentano demonstrated in front of the jury at trial was disingenuous, insincere, and completely contrived. Celentano's sentence must be sufficient to provide specific deterrence from committing future crimes of violence.

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).

U.S.S.G. § 5G1.2(d) states, in the case of convictions for multiple counts, "If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment,

46

then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law."

Here, the government is recommending a total sentence that exceeds the statutory maximum of any particular count of conviction.   But if the court were to impose a sentence beyond the 96-month statutory maximum sentence for Count One, it could order that the sentences on the remaining counts be served consecutively or partially consecutively to the sentence on Count One to the extent necessary to effectuate the total term of incarceration.

## F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being

asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).[8]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Thomas Webster*, 21-cr-208 (APM), the defendant, like Celentano, verbally and physically attacked officers on the West side of the Capitol.   Although Webster wore body armor and used a flagpole when he physically attacked a police officer on the Lower West Terrace, Webster only assaulted one officer at one location.   Celentano attacked several officers at various locations, and he moved towards the Capitol with each attack.   Thus, Celentano's conduct was more pronounced, prolonged, and persistent, as opposed to Webster's brief assault in the opening minutes of the riot. Both Celentano and Webster took their cases to trial and gave false testimony.   Judge Mehta sentenced Webster to 120 months of incarceration. The government's recommended sentence of 135 months' incarceration for Celentano would not create an unwarranted disparity with similar sentences imposed in January 6 cases in light of Judge Mehta's sentence in Webster.

In *United States v. Doug Jensen*, 21-cr-006 (TJK), this Court sentenced the defendant for violations of 18 U.S.C. § 111(a) and §1512.   Jensen entered the Capitol and followed Capitol Police Officer Eugene Goodman through the building.   Jensen, however, did not make physical contact with Officer Goodman.   Unlike Jensen, Celentano attacked MPD Officer Abdi, an unknown officer, and then assaulted Capitol Police Officer Ellis.   Both Jensen and Celentano have a criminal history category I.   For a non-contact assault, this Court sentenced Jensen to 60 months incarceration.   Justice demands a much lengthier period of incarceration for Celentano, who physically attacked multiple officers.

In *United States v. Vincent Gillespie*, 22-cr-60 (BAH), Judge Howell sentenced the defendant to 68 months incarceration for a violation of 18 U.S.C. § 111(a) and  § 231.   Like

Celentano, Gillespie physically had his hands on a police officer, he also used a riot shield to push against the police. Both Gillespie and Celentano have a criminal history category of I.  Like Celentano, Gillespie was charged with, but not convicted of a violation of §1512. Unlike Gillespie, Celentano attacked multiple police officers. Justice demands a lengthier period of incarceration for Celentano, who attacked multiple officers.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  §3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or

deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).    Celentano was convicted of a violation of an offense under Title 18; therefore, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[9]

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Celentano to pay $2,000 in restitution for his convictions on Counts One through Six. This amount fairly reflects Celentano's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

52

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 135-months' incarceration, three-years' supervised release, $2,000 restitution, and $300 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    _/s/ Jacqueline Schesnol_____
JACQUELINE SCHESNOL
SHALIN NOHRIA